OPINION OF THE COURT
Albert M. Rosenblatt, J.
At issue is the potential spread or threat of AIDS (Acquired Immunodeficiency Syndrome)[1] at Downstate Correctional Facility in Fishkill, New York.
*698 Procedurally, the petitioners, as inmates at Downstate, have proceeded under CPLR article 78, alleging that the Department of Correctional Services has established an AIDS program at Downstate without adequate and proper facilities, and that petitioners’ rights and those of others similarly situated are being violated.
The petitioners seek an injunction against forming or maintaining a central AIDS program at Downstate, and an order halting all inmate and employee movement in and out of the prison until examinations are given to inmates and employees to insure that the disease has not spread. Lastly, they seek an order removing all AIDS sufferers from the prison for treatment at a hospital.
The State denies the existence of “any threat to the health and/or safety of the petitioners,” and seeks dismissal, asserting that petitioners, inter alla, have not shown themselves to be affected by any action or policy of the respondents. Commendably, the Attorney-General focused on the merits, subordinating technical arguments.
The court held a hearing, both at Downstate and in the courthouse, at which it took proof on the incidence of AIDS at Downstate, the care and housing of afflicted inmates, the facility’s medical and hygienic procedures, and other evidence, including medical testimony, in order to determine — to the extent that current scientific knowledge allows — whether people at Downstate are in any special danger of contracting the syndrome.
There is no doubt that this proceeding was generated by widespread concern over the threat of AIDS to the national population generally, and, in particular, to certain “high risk” groups, including those which, to a significant degree, inhabit correctional facilities.
News reports of the potential spread of the syndrome have been enough to alarm anyone, through media characterizations of hysteria,[2] epidemic,[3] tragedy,[4] lethal mys *699 tery,[5] and the deadly spread[6] of a phenomenon which one journalist termed a potential threat to the United States blood supply.[7]
The top health official of the United States called the battle against AIDS the number one priority of the United States Public Health Service.[8]
Further, media accounts have produced a heightened anxiety among homosexuals, a group reported to be a prime target of AIDS. The accounts have described a frightened homosexual community,[9] the appearance of hot lines, crisis centers, medical advisory boards, and informational newsletters for homosexuals.[10]
After homosexuals, the affliction most often strikes intravenous (IV) drug users.[11]
These journalistic accounts have been fortified by equally disquieting medical and scientific writings which stress the enigmatic relentless nature of the ailment.[12]
It would be surprising, amid this climate of national concern, if an unsettling atmosphere did not exist among inmates and correction officers in the very institutions which combine a relatively high incidence of intimate sexual contact among males, and a significant number of IV drug users — the two most afflicted AIDS groups. The popular press has reported as much.[13] Indeed, the coalescence of the two high-risk groups marks it for special attention.[14]
*700 That being so, it falls to the court to evaluate the risks by examining the known features of AIDS as measured against the existing conditions at Downstate.
THE SYNDROME
Much of the information and statistical data on A TPS emanates from the United States Department of Health and Human Services, Public Health Service, Centers for Disease Control in Atlanta, Georgia (hereinafter CDC), which define AIDS, for purposes of epidemiologic surveillance, as “a reliably diagnosed disease that is at least moderately indicative of an underlying cellual immunodeficiency in a person who has had no known underlying cause of cellular immunodeficiency, nor any other cause of reduced resistance reported to be associated with that disease.”[15]
Dr. John P. Hanrahan, an internal medicine specialist and epidemiologist at the CDC, testified that the cellular immunodeficiency referred to is a condition in which the body’s immune system is compromised, impairing its ability to resist infections which, in the normal system, would be easily defeated.[16]
As a result of this dysfunction, the body becomes a defenseless host to an array of opportunistic infections or rare cancer disorders, notably, a previously exotic malignancy known as Kaposi’s sarcoma[17] which, though formerly limited to males in equatorial Africa and elderly men of eastern European descent,[18] has now appeared in 30% of all AIDS cases, and a variety of pneumonia — generally fatal for AIDS sufferers — which has appeared in 50% of all AIDS cases.[19]
*701 The immunodeficient condition produces symptoms which include enlarged lymph nodes (swollen glands), diarrhea, unexplained weight loss, and persistent skin markings associated with Kaposi’s sarcoma.[20]
Its incubation period is uncertain and is variously said to range anywhere from 1 to 4 years.[21]
THE DEMOGRAPHICS OF AIDS IN COMPARISON TO THE PRISON POPULATION
Downstate Correctional Facility is a reception and classification center. Its inmate population is slightly over 1,000, but there is a monthly turnover of more than two thirds. Prisoners enter Downstate for classification and are sent to other correctional facilities in the State. Thus, over the course of a year, there would be almost 10,000 inmates passing through Downstate. Of these, the majority are from New York City.[22]
1,922 cases of AIDS have been reported in the United States and Puerto Rico as of July 26, 1983, 75% of whom were homosexuals, 13% were heterosexual IV drug users, 6% were heterosexual, drug free, Haitians, and 0.3% were hemophiliacs who did not fall into the other three groups. The remaining 5% fall outside of the four groups.[23]
Nationally, a narrow geographic distribution has been identified, in which a. substantial number of AIDS victims are from New York City; 45%, or more than four times greater than the next highest city, San Francisco.[24]
*702 More than 700 cases were reported in New York City in 1983, with the figure doubling monthly, and predictions of possibly 20,000 cases within two years.[25]
On considerations of age,[26] sex, and geographical distribution, coupled with the homosexual and IV drug user prison population, it must be, and indeed is, recognized[27] that a State correctional facility such as Downstate is a potentially high-risk setting for AIDS.
These figures are not disputed by the State, and confirm the testimony of Dr. Hanrahan. He noted that approximately 42 New York State inmates have been diagnosed as having AIDS, and that 40 or 41 of them were found to have been IV drug users. Three AIDS victims are at Downstate, and the remainder are scattered at various correctional facilities throughout the State. He believes strongly in disseminating information among inmates, to reduce whatever panic, hostility, or frustration may be spawned by ignorance or rumors. To that end, he has helped in the preparation of fact sheets for prisoners.
Fear remains, and rumors persist. Much of the apprehensiveness exists because no one is completely sure how AIDS is spread, and no one has conclusive answers as to the relationship between contact and risk.
THE COMMUNICABILITY OF AIDS
Dr. Hanrahan testified that homosexuals and IV drug users fall into high-risk categories, under the prevailing scientific view that the disorder is passed by intimate mucosal contact, which occurs upon sexual encounters between males, or by blood transfer, which accounts for the incidence among IV drug users, and, presumably, hemophiliacs.[28]
*703 The present weight of scientific authority, as reported in the medical journals, adopts this premise. “The distribution of the syndrome best fits the hypothesis that AIDS is caused by a biologic agent transmissible by a variety of routes, including sexual contact and intravenous injection.”[29]
Other commentators agree,[30] but the appearance of the disorder in Haitians, and in others who disclaim affiliation with any of the other three prime-risk groups, is largely inexplicable,[31] although experts are quick to point out that such disclaimers are not verifiable.[32]
Because the pathogenesis of AIDS remains unknown,[33] fears are bound to multiply with each new report of its assault upon someone whom the infectious agent hypothesis does not readily fit.[34]
The current medical evidence, including Dr. Hanrahan’s, supports the view that AIDS is not communicable by means other than sexual contact or through blood. The New York State Department of Health has declared that “airborne and interpersonal spread through casual contact do not seem likely,”[35] and the Centers for Disease Control state that such contact offers little or no risk.[36] These technical writings, candid, scholarly, and openly uncertain as they are, leave room for discomfort to an unsophisti *704 coted prisoner who is ordered to clean a vacated AIDS room upon the vague assurance that, in all likelihood, he will not contract AIDS. The high mortality rate has increased the anxiety,[37] as have the reports of stricken children,[38] and animals.[39]
The practice at Downstate involves a system of application and compulsory assignment for prison jobs, including prison hospital duty. Inmates who learned that AIDS sufferers were in the hospital sought to have their assignment transferred, and were told, in keeping with the rules, that there could be no transfer until the lapse of 60 days, a preexisting prison policy designed to discourage frivolous or repeated requests for job transfers. This disturbed inmates because they were told that if they did not show up for work in the hospital they would be written up with disciplinary charges, and one was, in fact, written up when he refused to go to the hospital. He testified at the hearing that he refused to go to the hospital because he was afraid of AIDS.
The hearing also established that at no time was any inmate ever directed to go into a room while an AIDS patient was in it. There was one incident, however, when an inmate-porter or two were told to clean the vacated room of an AIDS patient. They refused and then complained to a higher supervisor who told them they could wait 24 hours — in keeping with the practice for hepatitis-13. Apparently, that ended the dispute.
The conclusion, based on the evidence, is that (a) no inmate has ever been forced to go into a room while an AIDS sufferer was there; (b) inmates, while receiving job assignments, were never told that a hospital assignment involves working at a facility where AIDS sufferers are confined, and (c) inmate-porters are compelled to clean out vacated AIDS rooms, after the patients have left.
Testimony also established that nurses go in and out of the rooms while AIDS sufferers are inside, and that the *705 nurses do not normally wear masks, gloves, or gowns while doing so. This practice is less stringent than the standard which Lieutenant Sperbeck (the security deputy) set for correction personnel. Correction officers are presumably bound by Sperbeck’s memorandum, but a degree of laxity seems to have been tolerated.
The testimony of a prison nurse established that the AIDS sufferers are contained in a four-bed ward. They have a telephone, some other amenities, and they go to an isolated yard for one hour a day for exercise. The garbage is bagged by the nursing staff, and left for the inmate-porters who pick it up after it is double bagged, so that the inmate-porters do not touch the bag that was in the room.
Tuberculosis patients, she said, use the same exercise yard as the AIDS patients, but not at the same time.
The nurses are instructed to wear gloves when removing and emptying garbage from the AIDS room. They have discretion to go in and out of the AIDS room without gear whenever appropriate, if their purpose is merely to visit or check. If the nurses do anything involving bodily secretions or fluids, they wear the masks, gloves, and gowns, but they often otherwise enter and leave the area without those appurtenances. The testimony established that there is no physical contact between inmate-porters and AIDS patients, and the court finds no credible evidence to the contrary.
Dr. Hanrahan, in asserting that there is no evidence that AIDS is spread by airborne means or through casual contact, has acted on his representations by himself having unprotected, casual contact with AIDS patients. Moreover, he testified that there is no risk to anyone who uses a shower stall after an AIDS patient has used and disinfected it, and no dangers from mixing mattresses. Eating utensils and plates used by AIDS patients at Downstate are disposable, and are disposed of.
He sees no danger in nurses first having casual contact with AIDS people while not wearing masks and gloves, and then going into the general population, provided that the nurse does not carry any mucosal secretions from the AIDS victims. All of these observations are in accord with the prevailing medical views.[40]
*706 A greater risk, in connection with masks and gloves, involves the danger not from, but to AIDS victims who are susceptible to infections from healthy people. One nurse testified that if, during casual contact, she wore a mask it would be not for her benefit, but to protect AIDS patients from common cold germs or other potential infections to which AIDS victims could succumb.
In sum, he stated that the proper regimen for care and confinement of AIDS sufferers is to follow the established procedures for maintaining hepatitis-B patients. Essentially, this involves the use of meticulous care in avoiding wounds through AIDS contaminated instruments, precautions in handling needles, syringes, blood, and other body fluids, the use of gowns, masks, gloves, hand washing, labeling fluids, the bagging of soiled articles, as well as other precautions.
The precautions are spelled out in full.[41]
Dr. Hanrahan testified that Lieutenant Sperbeck’s Downstate internal memorandum of May 6, 1983, fulfills the required standards for hepatitis-B and, in turn, for AIDS.
TRANSMISSION BY INMATES THROUGH MUCOSAL CONTACT AMONG MALES
The best available medical authority, as presented by the testimony adduced at the hearing, and the overwhelming weight of respectable medical opinion, argues for the infectious agent theory, predominantly by means of mucosal contact among males.[42]
Put differently, it is not one’s status or condition as a homosexual or a drug addict that invites the disease, but the activities associated with and performed by homosexuals[43] and IV drug users that is believed to imperil them. *707 Cessation of those activities before infection would, according to the medical authority, presumably foreclose the disease.
Abstinence is said to be the surest safeguard for homosexuals and IV drug users. To the degree that free will exists, it provides a path of avoidance for those who choose to curb or eliminate the dangerous practices.
Homosexual organizations have issued the loudest and clearest warnings.[44] Theoretically, the same choices should exist in prison. We know, however, that sexual intimacy among inmates is often not a matter of sexual preference, but of sexual compulsion. The notoriety of sexual violence, force and intimidation in prison is disturbing enough, and has long troubled sentencing Judges and others[45] without the imposition of an additional dimension of jeopardy. This feature is unique to prisons and was alluded to during the hearing as a particular source of anxiety, which the court considers genuine.
In deciding this lawsuit, the court is not asked to “ban” forcible sex in prison. It is already illegal. Nor is the court issuing declaratory opinions on the circumstances under which the State would or would not be liable to a prisoner who contracts AIDS through forced sex. These concerns are hypothetical and irrelevant to this action, but underscore the vastly different conditions and opportunities for the spread of the ailment through prison, in contrast to the outside.
In addition to other ironies brought by AIDS,[46] the dissemination of information among inmates may reduce the incidence of prison sex, and this court will therefore direct that the respondents hand each Downstate inmate a copy of the AIDS brochure prepared and published by the New York State Department of Health.
*708 Beyond that, this case does not present any procedural avenue (or factual evidence) for any determination that AIDS has been contracted by any Downstate prisoner by means of sexual coercion, nor does it entail any request that all Downstate inmates be isolated from each other. The court, sensitive to petitioners’ concerns over the possible transmission of AIDS by force, has no occasion, on this record, to do more than note the State’s obligation to provide a safe and humane place of confinement for its inmates (Correction Law, § 70, subd 2; § 23, subd 2).
As for those known to have been afflicted, the record establishes that the State, in adequately segregating those prisoners, has acted reasonably in endeavoring to prevent the types of forcible confrontations which we have hypothesized.
TESTING FOR AIDS
The petitioners have asked that all traffic in and out of Downstate be enjoined until entrants are screened and declared free of the disorder. The relief cannot be granted, because just as there is no known cure for AIDS,[47] there is no known test[48] by which to detect it.
Dr. Hanrahan testified that low lymphocyte counts, for example, may be suspicious, but are inconclusive, and that by deferring isolation until further diagnosis the prison is not acting irresponsibly.
In this context, it must also be remembered that outside of prison there is no law or practice requiring that suspected AIDS patients be quarantined.
The court need not now direct that a test be given if and when one is devised.[49] Its scientific acceptability, coupled with an unreasonable refusal by the State to give it, would first have to be established.
THE PROPOSED REMOVAL OF AIDS PATIENTS TO A HOSPITAL
Under section 141 of the Correction Law, a court has the authority to direct the removal of inmates from a *709 correctional facility “[i]n case any pestilence or contagious disease shall break out among the inmates”. The situation does not justify the invocation of section 141. The three patients are already isolated in the manner described. Dr. Hanrahan discussed the arguments for and against confinement and segregation of AIDS patients and the spectre of leper type “colonies.”[50] The presence of AIDS sufferers among the free population has not been medically viewed as a threat grave enough to justify wholesale quarantine. By contrast, the AIDS sufferers at Downstate are largely isolated from the others, and their removal to a civil hospital is not necessary, as long as the precautions for hepatitis-B are followed in the prison.
ESTABLISHMENT OF AN AIDS CENTER AT DOWNSTATE
The State, at the hearing, emphatically disavowed any present intention of establishing an AIDS colony at Downstate, or of otherwise congregating AIDS patients there. Moreover, there is no evidence that they have begun to do so. Because of this representation, the court will consider this phase of the requested injunction as moot. The creation of such a program or colony would indeed be a matter of supreme interest to both correction officers and inmates, as well as to the petitioners, who have alleged that Downstate Correctional Facility is not equipped to handle any large scale presence of AIDS sufferers. The court, for the reasons given, need not determine whether Downstate is or is not capable of such a program, but directs that before any such program is instituted at Downstate the respondents must give 30 days’ public notice of such intention so that, in the event the State ever seeks to change its plans there may be an opportunity for an interested person or group to petition, if one be so advised.
In other respects, this case presents highly unusual procedural features. The petitioners, except for the two directives set forth, have not established the commission of any official act, or any omission which would require some judicial override. The Downstate medical personnel have, *710 by and large, followed the hepatitis-B regimen. The court finds that as of this moment the hepatitis-B precautionary measures and the Sperbeck memorandum for guards and prisoners are entirely suited for defining the parameters of contact between AIDS victims and others.
As long as they are followed, the court has no need to intervene. Procedurally speaking, the court might order that these practices must continue, and that any deviation would be actionable. In that manner, the present actions of the respondents would be given permanent judicial imprimatur.
After extensive deliberation, the court concludes that such a procedural resolution would be unwise. Apart from one’s reluctance to treat the separation of powers so lightly, such an order would cast the court in the position of managing the prison. However expansive such practices have recently become,[51] the prospect would be unworkable here.
The scientific knowledge and hygienic procedures with regard to AIDS may be expected to change, with each new medical advance. In a month, a practice accepted today may be discarded in favor of a new approach which may have everything or nothing to do with hepatitis-B.
In a matter of time, the ailment may be conquered, or inhibited by tactics which are as yet unfathomed. The court cannot suitably act as an administrative body on an ongoing basis.
The more practical solution is to dismiss the action except to the extent that directives are afforded herein-above, with leave to renew the proceeding before any Justice of the Supreme Court, upon a claim that the State has acted improperly. A court can evaluate the claim and measure it against the conditions then existing.
This court, in so ruling, does not intend to charge the named petitioners with the obligation of monitoring this or any other action, nor does the court imply that the petitioners are privileged to remain at Downstate in order to do so. As for the State’s possible concern that this ruling *711 might leave the door open for redundant or frivolous litigation, this court has no doubt as to the ability of the courts to make the proper distinctions by dismissing meritless applications, and acting upon deserving ones.
The petition, except to the extent that relief has been specifically ordered hereinabove, is dismissed, without prejudice to renewal upon such grounds as may, in the opinion of a reviewing court, be justified.

. Sometimes called Acquired Immune Deficiency Syndrome.

. Disease Detectives: The AIDS Hysteria, Time magazine, cover article, July 4, 1983, p 50; Schwartz (Associated Press), The Aids Scare — Fear of Contracting Disease Spreading Across the Country, Poughkeepsie Journal, July 4, 1983, p 9.

. Battling a New Epidemic, Time magazine, March 28, 1983, p 53; Sullivan, Experts Testify AIDS Epidemic Strikes the City, New York Times, May 17, 1983.

. Altman, Medicine May Learn From the Tragedy of AIDS, New York Times, May 10, 1983, p C-2.

. AIDS: A Lethal Mystery Story, Newsweek, Dec. 27, 1982, p 63.

. The Deadly Spread of AIDS, Time magazine, Sept. 6, 1982.

. Colen, A Potential Threat to U.S. Blood Supply, Newsday, Sept. 15, 1982.

. Health Chief Calls AIDS Battle No. 1 Priority, New York Times, May 25, 1983.

. Rare Cancer Frightens Homosexual Community, Poughkeepsie Journal, Aug. 5, 1982 (Associated Press); Herman, A Disease’s Spread Provokes Anxiety, New York Times, Aug. 8, 1982.

. GMHC Newsletter (Gay Men’s Health Crisis, 132 West 24th St., New York, N. Y. 10011).

. Centers for Disease Control, MMWR, vol 32, No. 24, June 24, 1983.

. Marx, New Disease Baffles Medical Community, Science, vol 217, Aug. 13, 1982; Lawrence, AIDS — No Relief in Sight, Science News, vol 122, p 202, Sept. 25, 1982; Acquired Immunodeficiency Syndrome Cause(s) Still Elusive, JAMA, vol 248, No. 12, Sept. 24, 1982, p 1423.

. Omicinski (Gannett News Service), AIDS Epidemic Hits State Prisons, Poughkeepsie Journal, April 15, 1983, p 8.

. State of New York, Department of Health Memorandum, Series 83-27, March 30, 1983; see, also, Immunodeficiency Among Female Sexual Partners of Males with AIDS, Centers for Disease Control, MMWR, vol 31, No. 52, p 697, Jan. 7, 1983.

. Centers for Disease Control, MMWR, vol 32, No. 24, June 24, 1983.

. Masur, An Outbreak of Community-Acquired Pneumocystis Carinii Pneumonia — Initial Manifestation of Cellular Immune Dysfunction, New England Journal of Medicine, vol 305, No. 24, Dec. 10, 1981, p 1431.

. Acquired Immunodeficiency Syndrome Cause(s) Still Elusive, JAMA, vol 248, No. 12, Sept. 24, 1982, p 1423.

. Disease Control Bulletin, vol 2, No. 5, Aug. 27, 1981; Sexually Transmitted Disease Newsletter, vol 5, No. 6, June, 1982; Durack, Opportunistic Infections and Kaposi’s Sarcoma in Homosexual Men, New England Journal of Medicine, vol 305, No. 24, p 1465, Dec. 10, 1981, p 1091; Centers for Disease Control, MMWR, vol 30, No. 25, July 3, 1981, p 305.

. State of New York, Department of Health Memorandum, Series 83-27, March 30, 1983; Masur, An Outbreak of Community-Acquired Pneumocystis Carinii Pneumonia — Initial Manifestation of Cellular Immune Dysfunction, New England Journal of Medicine, vol 305, No. 24, Dec. 10, 1981, p 1431.

. State of New York, Department of Health Memorandum, Series 83-27, March 30, 1983; City Health Information, vol 2, No. 11, March 16, 1983.

. Andreani, et al.. Acquired Immunodeficiency with Intestinal Cryptosporidiosis: Possible Transmission by Haitian Whole Blood, The Lancet, May 28, 1983, p 1187; Harris, et al., Immunodeficiency in Female Sexual Partners of Men with the Acquired Immunodeficiency Syndrome, New England Journal of Medicine, vol 308, No. 20, May 19, 1983, p 1181; Prevention of Acquired Immune Deficiency Syndrome, JAMA, March 25, 1983, vol 249, No. 12, p 1544.

. These figures are supplied by the New York State Department of Correction, in a printout which this court is appending to the record.

. See Centers for Disease Control, MMWR, July 15, 1983, and New York Times, July 31, 1983, p 1.

. Centers for Disease Control, MMWR, vol 32, No. 24, June 24, 1983; Centers for Disease Control, MMWR, vol 31, No. 37, Sept. 24, 1982, p 507; State of New York, Department of Health Memorandum, Series 83-27, March 30, 1983; City Health Information, vol 2, No. 11, March 16, 1983.

. Sullivan, Experts Testify AIDS Epidemic Strikes the City, New York Times, May 17, 1983.

. Special Report, New England Journal of Medicine, vol 306, No. 4, Jan. 28, 1982, pp 248, 250.

. State of New York, Department of Health Memorandum, Series 83-27, March 30, 1983.

. The medical literature has it that previously healthy females who have contracted AIDS may have been infected by male partners who carried a transmissible agent (Immunodeficiency Among Female Sexual Partners of Males with Aids, Centers for Disease Control, MMWR, Jan. 7,1983, vol 31, No. 52, p 697). This, of course, is premised on the hypothesis, unproved as of yet, that AIDS is communicated by an infectious agent.

. Harris, et al., Immunodeficiency in Female Sexual Partners of Men with the Acquired Immunodeficiency Syndrome, New England Journal of Medicine, vol 308, No. 20, May 19, 1983, p 1181.

. Ammann, et al., Acquired Immunodeficiency in an Infant; Possible Transmission by Means of Blood Products, The Lancet, April 30,1983, p 956; Andreani, et al., Acquired Immunodeficiency with Intestinal Cryptosporidiosis: Possible Transmission by Haitian Whole Blood, The Lancet, May 28,1983, p 1187; Acquired Immune Deficiency Syndrome Cause(s) Still Elusive, JAMA, vol 248, No. 12, Sept. 24, 1982, p 1423.

. Marx, New Disease Baffles Medical Community, Science, vol 217, Aug. 13, 1982.

. Centers for Disease Control, MMWR, vol 32, No. 27, July 15, 1983, pp 349, 359.

. Vieira, et al., Acquired Immune Deficiency in Haitians, New England Journal of Medicine, vol 308, No. 3, Jan. 20, 1983, p 12.

. In order to reconcile the infectious agent theory with the seemingly inexplicable presence of the disorder among Haitians, it has been conjectured that the disease may have been communicated through homosexuals vacationing in Haiti (Vieira, et al., Acquired Immune Deficiency in Haitians, New England Journal of Medicine, vol 308, No. 3, Jan. 20, 1983, p 125). The Haitians, however, are highly distraught over what they claim to be an unwarranted stigmatization (see New York Times, July 31, 1983, p 1).

. State of New York, Department of Health Memorandum, Series 83-27, March 30, 1983.

. Centers for Disease Control, MMWR, vol 32, No. 24, June 24, 1983.

. Lawrence, AIDS — No Relief in Sight, Science News, vol 122, p 202, Sept. 25, 1982; Acquired Immune Deficiency Syndrome — An Interim Report, Infectious Disease Section, California State Dept of Health Servs, No. 43, Nov. 5, 1982.

. Pediatric Alert, vol 8, No. 1, Jan. 6, 1983; Unexplained Immunodeficiency and Opportunistic Infections in Infants — 'New York, New Jersey, California, Centers for Disease Control, MMWR, vol 31, No. 49, Dec. 17, 1982, p 665.

. Science News, vol 123, No. 10, March 5, 1983, p 151.

. Disease Control Bulletin, vol 3, No. 21, Dec. 20,1982; Centers for Disease Control, MMWR, vol 32, No. 27, p 349, July 15, 1983.

. Disease Control Bulletin, vol 3, No. 21, Dec. 20, 1983.

. Gottlieb, et al., Pneumocystis Carinii Pneumonia and Other Mucosal Candidiasis in Previously Healthy Homosexual Men, New England Journal of Medicine, vol 305, No. 24, Dec. 10, 1981, p 1430; Siegal, Severe Acquired Immunodeficiency in Male Homosexuals, Manifested by Chronic Perianal Ulcerative Herpes Simplex Lesions, New England Journal of Medicine, vol 305, No. 24, Dec. 10, 1981, p 1439.

. Including the use of nitrites, a suspected contributing factor, according to some researchers (Nichols, Opportunistic Infections and Kaposi’s Sarcoma in Homosexual Men — The Inhalation of Alkyl Nitrites as a Possible Contributing Factor, New England Journal of Medicine, vol 306, No. 15, p 932, April 15,1982; Acquired Immunodeficiency Syndrome Cause(s) Still Elusive, JAMA, vol 248, No. 12, Sept. 24, 1982, p 1423). Also, genetic predisposition has been explored (Levine, The Epidemic of Acquired Immune Dysfunction in Homosexual Men and its Sequellae, Cancer Treatment Reports, vol 66, No. 6, June 1982, p 1391).

. GMHC Newsletter (Gay Men’s Health Crisis, 132 West 24th St., New York, N. Y. 10011); in other contexts, various types of litigation have been initiated (see Appelson, National LJ, July 25, 1983).

. Lockwood, Prison Sexual Violence, New York; Estevier, 1980; Carlton, The Terrifying Homosexual World of the Jail System, New York Times, April 25,1971, p 40.

. Altman, Medicine May Learn From the Tragedy of AIDS, New York Times, May 10, 1983, p C-2.

. Levine, The Epidemic of Acquired Immune Dysfunction in Homosexual Men and its Sequellae, Cancer Treatment Reports, vol 66, No. 6, June, 1982, p 1391; Centers for Disease Control, MMWR, vol 30, No. 33, Aug. 28,1981; Lawrence, AIDS — No Relief in Sight, Science News, vol 122, p 202, Sept. 25,1982; Infectious Disease Alert, vol 2, No. 7, Jan. Í, 1983.

. Centers for Disease Control, MMWR, vol 31, No. 37, Sept., 1982, p 507; State of New York, Department of Health Memorandum, Series 83, March 30,1983; City Health Information, vol 2, No. 11, March 16, 1983.

. Miller, Immunity Syndrome: New Test, New Ideas, Science News, vol 123, No. 13, March 26, 1983.

. Fisher, Stress: The Unseen Killer in Aids, American Psychological Association Monitor, July 1983, p 1.

. Horowitz, The Judiciary: Umpire or Empire? Law and Human Behavior, vol 6, No. 2, p 129.