**Carmen Jean HARRIS; et al., Plaintiffs,**

v.

**Morris THIGPEN, Etc.; et al., Defendants,**

**Stewart M. Hughey; et al., Intervening Defendants.**

**Civ. A. No. 87V–1109–N.**

United States District Court, M.D. Alabama, N.D.

Jan. 8, 1990.

Alexa P. Freeman, Elizabeth Alexander, ACLU Nat. Prison Project, Washington, D.C., Howard A. Mandell, Mandell & Boyd, Montgomery, Ala., Nancy Ortega, Steve Bright, Southern Prisoners Defense Committee, Atlanta, Ga., for plaintiffs.

David B. Byrne, Jr. & Scott R. Talkington, Robison & Belser, Harry A. Lyles, Horace N. Lynn and Andrew W. Redd, Legal Div., Alabama Dept. of Corrections, Montgomery, Ala., for Alabama Dept. of Corrections.

Dorothy F. Norwood, Correctional Health Care, Inc., Mt. Meigs, Ala., Geary A. Gaston, Reams, Vollmer, Philips, Killion, Brooks & Schell, Mobile, Ala., for Correctional Health Care, Payne & Sutton.

David B. Byrne, Jr., Montgomery, Ala. (court-appointed), for intervening defendants.

## OPINION

VARNER, District Judge.

This cause is now before the Court for final determination after trial and filing of post-trial briefs and amendments to said briefs by all parties.

This case involves the constitutionality of CODE OF ALABAMA [1975], § 22–11A–17, which requires testing of inmates for AIDS upon admission and within 30 days of release, construction of § 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, as well as the constitutional rights of inmates (both sick and well) as to the propriety of testing and segregating those testing positive. A class of inmates has been certified pro and con.

On page 2 of the Complaint filed herein June 24, 1988, Plaintiffs claim allegedly unconstitutional practices by the authorities at the Alabama Department of Corrections [DOC]:

(1) By requiring all prisoners to submit involuntarily to blood tests against their will shortly after incarceration in, and shortly before release from, a State penal institution.

(2) By failing to advise prisoners as to the inconclusive and sometimes misleading significance of the results.

(3) By failing to provide essential emotional support and mental health counseling to those prisoners who test positive.

(4) By compelling prisoners who test positive to live with all other prisoners who have tested positive in segregated units that are "like leper colonies".

(5) By the mere fact of their segregation, publicly branding such segregated prisoners as carriers of a dread, socially unacceptable and fatal disease independent of security from each other.

(6) By causing those prisoners to lose the opportunity to participate in vocational and educational programs, to earn good time credits and to participate in work release

and similar programs and, therefore, limiting their opportunities for early release and for parole.

(7) By providing them with grossly deficient medical, mental health and dental care.

Plaintiffs contend that the above practices deny Plaintiffs rights guaranteed by the First, Fourth, Eighth and Fourteenth Amendments to the United States Constitution and by § 504 of the Rehabilitation Act of 1973. Jurisdiction is claimed pursuant to 28 U.S.C. § 1331 and the Rehabilitation Act.

It is alleged that Plaintiffs are all administratively segregated AIDS carriers. Men are kept in Dormitory 7 at the Limestone Facility except that those with security classifications of close, maximum or protective are kept in cells at Limestone and women are kept in a block at the Tutwiler Unit for women. With few exceptions, they are segregated from other prisoners, allowed to use libraries and recreation yards and facilities sparingly and denied the opportunity to do substantial work, in and out of the institutions, so as to prepare for and earn various types of conditional release.

Defendants are (1) Morris Thigpen, Commissioner of the DOC, who is responsible for the control of the DOC, including the enforcement of rules concerning testing and segregation of inmates; (2) Jean Hare, who is Warden of the Julia Tutwiler Prison for Women, charged with administering the HIV segregation unit at Tutwiler; (3) J.D. White, who is Warden of the Limestone Correctional Facility, charged with administration of the HIV segregation unit at Limestone; (4) Lynn Harrelson, Warden of the Kilby Prison, charged with implementing the HIV antibody testing program at Kilby; (5) Correctional Health Care, Inc., an entity under contract with the DOC to provide medical care services to Alabama State prisoners; and (5) Dr. George Sutton, Medical Director for Correctional Health Care, Inc. There is no serious question that all of these Defendants are acting under color of law. A class of inmates supporting Defendants' present policies

has been certified as Intervening Defendants in this case.

It appears to this Court, in regard to the class action status of this case, that the lawsuit as it stands challenges the mandatory testing of all present or future Alabama State prisoners for HIV antibodies and the forced segregation and other practices associated with treatment and/or care for those found to have HIV antibodies or active AIDS virus. The presence in one's blood of the antibodies is an indication that the subject has contracted or is irrevocably contracting the fatal AIDS.

AIDS now appears not to be an air-borne disease. It is thought to be transmitted only by contact of open wounds or body cavities with blood, semen or vaginal secretions—usually in sexual relations, by infusion or innoculation of blood in transfusions or intravenous needle-sharing activities or prenatally. Yet, many experts agree that, in a small percentage of known cases, there is no explanation of how the disease was transmitted. A primary reason for the mysteries surrounding the disease is the fact that no germs or indicia of the presence of the disease in a subject have been found and no tests are available to diagnose the disease. Blood tests do show identifiable antibodies (HIV antibodies) which show that a subject has contacted the disease and that the subject's system is seeking (or has sought) to reject the disease. Seropositives, persons whose blood contains those antibodies, may be otherwise healthy, but they are, for life, carriers of the AIDS disease and their maximum life expectancies are estimated by various experts to be as much as between two and eight years. One expert testified that AIDS is now curable, but all agreed that no one has ever been cured. AIDS, itself, does not cause death; it so weakens the immune system that an opportunistic disease (many of which do no harm to an AIDS–free person) is deadly. Seropositives carry the antibodies and can communicate the disease but display no outward symptoms, that is, they have had none of the opportunistic diseases, the presence of which are outwardly symptomatic of the AIDS disease. Drugs, such as AZT, have been helpful in combating and preventing some of the opportunistic diseases. The future of the seropositive is currently dim, but somewhat more hopeful.

In Paragraph 25, the Complaint suggests that the several tests for HIV antibodies which are indicative of AIDS are not always accurate. The experts agree that the ELISA test may produce a small number of false positives. In event of a positive ELISA, a second ELISA test is given by the DOC, and in the event of a second positive, a Western Blot test will be given. The Western Blot test sometimes indicates false negatives and, therefore, is not completely dependable. A combination of the tests may be inaccurate negatively because of the long (as much as one year) incubation period of the virus after exposure and before evidence of the virus is ascertainable, but is, apparently, infallible if the antibodies (HIV) have begun to form. AIDS is a diagnosis of a complex disease that causes a disfunction of the body's immune system against disease.

As might be expected, the basic claims of the Plaintiffs are strongly appealing to humanitarian nature as are the claims of people suffering similar problems in the free world. No one can be without sympathy for those who have or are reasonably suspected of having an incurable and fatal disease. However, it is well established that prisoners lose some of their freedoms because of the nature of themselves and their incarceration. The case necessarily involves a balance of rights of and duties to affected inmates with those of unaffected inmates and with the State's rights and duties to effect reasonable penological administration. Certain things are simply and naturally not available for unfortunate and perhaps unfair reasons. This Court cannot exempt anyone from the natural results of burdens he must bear. This Court is a Court of limited jurisdiction and must, therefore, turn to, and is jurisdictionally limited to, the technical constitutional and statutory claims advanced by the Plaintiffs.

Plaintiffs suggest the following:

A. The involuntary testing program constitutes an unlawful search and seizure in violation of the Fourth Amendment [Complaint, ¶ 58].

B. The involuntary testing program and the results thereof violate the right of privacy—not to have personal matters collected and personally disclosed—under the Fourteenth Amendment [Complaint, ¶ 59].

C. Public disclosure of the HIV positive tests causes prisoners to be branded as AIDS carriers, thereby constituting cruel and unusual punishment in violation of the Eighth Amendment because it causes wanton and unnecessary infliction of pain and is grossly disproportionate to the severity of the crimes committed by Plaintiffs for which they are punished [Complaint, ¶ 60].

D. The automatic segregation without a hearing and without regard to appropriate *classification* factors (such as propensity for violence) of prisoners testing positive denies such prisoners of substantive and procedural due process of law in violation of the Fourteenth Amendment to the Constitution [Complaint, ¶ 61]. The evidence shows that the only change in classification because of an inmate's having tested positive is that the inmate, upon testing positive, is no longer eligible for a "community" classification which effectively bars him or her from work-release type programs.

E. Denial to prisoners testing positive of eligibility for work release, educational programs, vocational training, employment, religious services, recreation and other opportunities denies equal protection of the laws in violation of the Fourteenth Amendment [Complaint, ¶ 62].

F. Denial of the opportunity to earn *good time* credits by working affects adversely the right to release and parole, thereby denying equal protection in violation of the Fourteenth Amendment [Complaint, ¶ 63].

G. Failure to provide adequate care for serious medical, dental and mental health needs is deliberate indifference to such serious needs and constitutes cruel and unusual punishment in violation of the Eighth Amendment [Complaint, ¶ 64].

H. The totality of the circumstances at Limestone and Tutwiler segregation units, including the public disclosure and consequences of disclosure, the ostracism, the exposure to and lack of protection from harm, the absence of adequate medical, mental health and dental care, the emotional distress engendered by disclosure without counseling of a positive test result for an incurable and inevitably fatal disease and the idleness subjects the prisoners to cruel and unusual punishment in violation of the Eighth Amendment [Complaint, ¶ 65].

I. The denial of meaningful legal access to prisoners for the purpose of challenging their convictions or their conditions of confinement denies them the right of access to courts protected by the First and Fourteenth Amendments [Complaint, ¶ 66].

J. The treatment of HIV positive prisoners discriminates against them as otherwise qualified handicapped individuals in violation of § 504 of the Rehabilitation Act of 1973, 29 U.S.C. §§ 701, *et seq.*, as amended by the Civil Rights Restoration Act of 1987 (effective March 22, 1988) [Complaint, ¶ 67].

█ It is well established that the most vile of criminals is not divorced from his constitutional rights by his conviction and incarceration for crime, but those rights end where the constitutional rights of others begin. Rights reserved to the States pursuant to the Tenth Amendment include punishment of criminals to the extent consistent with "legitimate penological interests." The test, therefore, of whether penal authorities violate constitutional rights of inmates is whether the authorities' actions are "reasonably related to legitimate penological interests." *Thornburgh v. Abbott,* — U.S. —, —, 109 S.Ct. 1874, 1879, 104 L.Ed.2d 459, 470 (1989); *Turner v. Safley,* 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987).

█ TESTS AND SEGREGATION. Paragraphs 58 and 59 of the Complaint raise inter-related claims that the tests for

AIDS given to all inmates upon induction into, and before discharge from, the penal system of Alabama constitute an unreasonable search and seizure and a violation of the inmate's right to privacy protected by the Fourth and Fourteenth Amendments. These paragraphs also relate to the claims in Paragraph 60 that segregation in the AIDS Unit at Limestone is cruel and unusual punishment in violation of the Eighth Amendment and in Paragraph 61 that such segregation without a hearing and without consideration of classification is a denial of due process of law protected by the Fourteenth Amendment. Because of the interrelationship, these claims will be discussed jointly.

This case, in a prison environment, is somewhat different from the usual search and seizure case and from usual privacy cases. There is a wealth of authority that inmates enjoy limited Fourth Amendment rights against search and seizure and that their privacy rights are very limited. The Fifth Circuit Court of Appeals in *United States v. York*, 578 F.2d 1036 (5th Cir. 1978), *cert. den.* 439 U.S. 1005, 99 S.Ct. 619, 58 L.Ed.2d 682, recognized that, although prisoners retain at least some degree of Fourth Amendment protection, the exigencies inherent to a prison environment together with the decreased expectation of privacy held by inmates, result in the requirement that the government merely show *reasonableness*, not probable cause, to validate the search of a prisoner [at 1041]. See also *Thornburgh v. Abbott*, supra, —— U.S. ——, 109 S.Ct. at 1880, 104 L.Ed.2d at 471. Incarceration also seems to limit otherwise legitimate Fourth Amendment privacy and possessory interests in personal effects. *Lanza v. New York*, 370 U.S. 139, 143, 82 S.Ct. 1218, 1220, 8 L.Ed.2d 384 (1962); *Hudson v. Palmer*, 468 U.S. 517, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984). A number of cases base the invasion of the prisoner's privacy rights, even to the extent of allowing body cavity searches, upon an obligation of prison officials to take "reasonable measures to guarantee the safety of the inmates and themselves * * * and must be ever alert to attempts to introduce drugs and other con-

traband into the premises * * *." *Hudson v. Palmer*, supra. Even more serious than introduction of contraband is the introduction of a fatal disease.

Even though a rational relationship to a legitimate State interest justifies invasion of an inmate's constitutional rights, this Court will consider the balance of rights of the intervening inmates and officials not to be unduly exposed to a fatal disease. In *Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447, 482 (1979), the Court balanced the significant and legitimate security interest of the institution against the private interest of the inmates in concluding the propriety of body searches. The Southern District Court in New York in *Baez v. Rapping*, 680 F.Supp. 112 (S.D.N.Y.1988), wisely denied the claim of an AIDS patient for damages for examining and reporting the condition of the prisoner to the facility, stating that the failure to issue a warning to prison officials to avoid contact with the bodily fluids of an AIDS carrier might itself be deemed a failure to perform official duties. That Court, in dicta, recognized a probable duty of prison officials to warn others to avoid contact with bodily fluids of an AIDS carrier.

Courts have recognized deference due decisions of prison officials generally in considering claims by inmates who have tested positive to HIV antibodies (indicating the ability to transmit the same to others). In an early case, *Cordero v. Coughlin*, 607 F.Supp. 9 (S.D.N.Y.1984), a group of segregated inmates with AIDS sued the New York State Department of Correctional Services alleging cruel and unusual punishment and deliberate indifference to their serious medical needs. They claimed that their segregation unconstitutionally fostered their mental and physical depression and deprived them of the equal protection of the laws by their being segregated because of their medical condition. They admitted they had no absolute right to rehabilitation programs, exercise or visitation, but argued that, since other inmates had such rights, the Equal Protection Clause guaranteed AIDS victims the same rights. Moreover, they claimed they were

forced to live under conditions worse than those in the disciplinary unit, without any finding of a disciplinary violation, simply because they had AIDS. The trial court found that the inmates had no constitutional right to freedom from segregation instituted to advance a reasonable correctional objective and that segregation is proper if it is necessary for the protection of inmates with AIDS and other inmates in the institution. The Court also held that there was no Eighth Amendment violation because the plaintiffs had not shown they were denied adequate food, clothing or shelter[1] and that equal protection claims were denied because the constitutional guarantee applies only to those similarly situated and the inmates with AIDS and other inmates in the institution were not, in the view of the Court, similarly situated. Clearly, the other inmates in the institution were not known carriers of the AIDS disease and have not been shown to have had the disease. Alternatively, if the Equal Protection Clause does apply, this Court finds that there is a legitimate government end and the means used are rationally related to that end. *Massachusetts Bd. of Retirement v. Murgia,* 427 U.S. 307, 96 S.Ct. 2562, 49 L.Ed.2d 520 (1976). AIDS victims are not a suspect class; therefore, the government must make only the aforementioned showing in order to uphold the present classification. See *Cordero v. Coughlin,* 607 F.Supp. 9, 10 (S.D.N.Y. 1984).

In Oklahoma cases, *Powell v. Department of Corrections* (ND Ok. Nos. 85C–8T20C and 85C–816C) [647 F.Supp. 968 (N.D.Okla.1986)] and *Morse v. Meachem* (WD Ok. No. 861304–T), the Courts reached the same conclusions as that reached in *Cordero,* supra, in regard to HIV seropositive inmates.

In *Farmer v. Levine* (USDC Md., 1985), No. HM–85–4284, 19, Magistrate's Report Dated May 28, 1986, the Court faced a claim by an AIDS infected prisoner that he had been placed in the disciplinary unit without a hearing or any specific bad conduct, denied of due process, equal protection, the right to privacy[2] and freedom of expression and association when he was segregated and denied access to rehabilitation programs. Farmer also complained that the guards routinely wore masks when entering his cell, left his meals at the opposite end of the cell rather than handing them to him directly and subjected him to similar forms of what he called abuse. While the magistrate's recommendation was that the county's segregation policy be upheld, the case became moot when Farmer was transferred to federal prison.

A number of well-reasoned opinions uphold a State's rights to require, over claims of violations of constitutional rights of privacy or against unlawful search and seizure, blood tests in various contexts. *State v. Alexander* (1951), 7 N.J. 585, 83 A.2d 441, *cert. den.* 343 U.S. 908, 72 S.Ct.

1. As to a claim of cruel and unusual punishment, the Supreme Court in *Atiyeh v. Capps,* 449 U.S. 1312, 101 S.Ct. 829, 66 L.Ed.2d 785 (1981), speaking through (now Chief) Justice Rehnquist, stated: "In short, nobody promised them a rose garden; and I know of nothing in the Eighth Amendment which requires that they be housed in a manner most pleasing to them, or considered even by most knowledgeable penal authorities to be likely to avoid confrontations, psychological depression and the like. They have been convicted of crime and there is nothing in the Constitution which forbids their being penalized as a result of that conviction."

2. The importance of confidentiality as to a patient's having a disease has long been recognized by the medical fraternity. Arguably, this arises from the theory that, if patients know that a doctor will disclose the fact that a patient is carrying an undesirable disease, the patient,

who suspects such a disease, may avoid discussing the matter with his doctor and the disease may not be treated and may result in infection of many others. This reason would obviously not apply in a prison setting where mandatory testing and segregation exists. Many jurisdictions have strong laws or policies mandating confidentiality of medical information regarding HIV infection and AIDS. No such law in Alabama has been reported. This Court has found no case in which confidentiality has been discussed in its constitutional sense. In an unreported opinion, *Sheridan v. Fauver* (USDC NJ, Nov.1987), the Court dismissed a case in which inmates sought to nullify a current policy that AIDS-related medical records might be seen by correctional officers. This Court knows of no case holding that any AIDS-related patient has any constitutional right to confidentiality of his condition.

638, 96 L.Ed. 1326 approved use of defendant murder suspect's blood sample, taken for venereal disease test, for comparison with blood on murder weapon. The Court stated, in rejecting the claim of illegal search and seizure, that earlier New Jersey decisions had recognized the constitutionality of such use and that " * * * no convincing * * * reason had been suggested * * * to change the rule which * * * for many years demonstrated its practical worth and its soundness in the administration of justice." See also *Lue Chow Kon v. Brownell*, 220 F.2d 187 (2nd Cir.1955); *United States ex rel. Dong Wing Ott v. Shaughnessy*, 220 F.2d 537 (2nd Cir.1955); *Anthony v. Anthony*, 9 N.J.Super. 411, 74 A.2d 919; *Cortese v. Cortese*, 10 N.J.Super. 152, 76 A.2d 717 (1950); *Goldsmith v. Goldsmith*, 279 App.Div. 579, 107 N.Y.S.2d 691 (1951).

Perhaps even more compelling is the fact that the Supreme Court, pursuant to its congressionally authorized rule-making power, 28 U.S.C. § 2072(a), prescribed Rule 35, Federal Rules of Civil Procedure, which provided that, where the condition (including that shown by blood tests) of a person in custody is in controversy, a court may order his examination. Obviously, the Supreme Court did not consider such an infringement to be constitutionally insecure. The Supreme Court, *Camden & Suburban Ry. Co. v. Stetson*, 177 U.S. 172, 20 S.Ct. 617, 44 L.Ed. 721 (1900), held that a State's statutory authority properly authorized such an examination. The Alabama statutory authorization for its blood tests and related actions is as follows:

§ 22–11A–17. "All persons sentenced to confinement or imprisonment * * * shall be tested for those sexually transmitted diseases * * * upon entering the facility, and any inmate so confined for more than 90 days shall be examined for those sexually transmitted diseases 30 days before release. The results of any positive * * * tests shall be reported as provided * * *."

§ 22–11A–18 requires persons having sexually transmitted diseases to submit to treatment by the county health officer or a private physician upon penalty of commitment for said purposes.

§ 22–11A–18 provides for quarantine or isolation of persons having notifiable diseases.

Undenied evidence shows that AIDS is, insofar as this case is concerned, both a sexually transmitted and a notifiable disease.

The Plaintiffs insist that they have rights of privacy which have been violated by allowance of spread of information that they are carriers of the AIDS disease. *Phillips v. Smalley Maintenance Service*, 435 So.2d 705 (Ala.1983), is an Alabama State Court case which mentions four different types of wrongs which may constitute a violation of the State right of privacy, as follows: (1) intrusion on plaintiff's physical seclusion; (2) publicity which violates ordinary decency; (3) putting plaintiff in a false, but not necessary defamatory, position in the public eye; and (4) appropriation of an element of plaintiff's personality for commercial use. *Restatement (Second) of Torts*, § 652 B (1977); 62 Am. Jur.2d 718, Privacy § 26. Dean Prosser described the conglomerate as the right "to be left alone", Prosser, Torts 3rd ed., p. 832, § 112. Plaintiffs can logically claim no such right. Because of crimes committed by them, they cannot be left alone. Because the State may face liability for exposing others to a dread disease, they must be secluded, in the opinion of State officials, from others. The cases relied upon by the Supreme Court of Alabama in *Phillips*, supra, are cases dealing with the right of privacy of a private individual. People who have made their privacy a matter of public interest or have, in effect, made themselves public, have waived their right to privacy and have no such right. Obviously, a prisoner has entrusted his or her person and his or her official care to the public by committing a crime for which he or she is convicted and he or she, therefore, becomes a public charge. Being a responsibility of the public, he or she necessarily loses many of his or her rights of privacy. This would be especially true of one who is a carrier of a disease for whose care the State is responsible and for whose

acts the State may be responsible. The public must expend for care of an AIDS patient far more than is expended for the care and treatment of the average inmate in a penal institution. Upon communication of the disease by the inmate to others, circumstances may well involve questions of the State's legal liability therefor, as well as a matter concerning the public health and welfare. An inmate's infection with AIDS is, therefore, not a private matter, but a matter of a controlling State interest.

In *Marsh v. Alabama Department of Corrections, et al.,* CV 86–HM–5592–NE (N.D.Ala.1987), Judge Haltom concludes that the segregation of AIDS infected inmates does not deprive those inmates of *equal protection* for the reasons that the inmates are *not similarly situated* to inmates in the general prison population and their isolation is *rationally related* to a legitimate State interest. This Court is of the opinion that the State's interest in preventing the spread of such a disease among prison inmates and prison officials, *inter alia,* amounts to a controlling State interest. The *Marsh* case cites *Cordero* and *Powell* which appear to be cases applicable to AIDS infected inmates and the segregation thereof. It appears to this Court that, even if this Court disagreed with Judge Haltom in *Marsh,* the parties would be bound by that decision pursuant to doctrines of *res judicata,* collateral estoppel or *stare decisis.* However, this Court is of the opinion that the decision was wisely entered. In a 1987 case, *Judd v. Packard,* 669 F.Supp. 741 (D.Md.1987), the Court ruled that the medical staff had the right to segregate an inmate with AIDS. In *Judd,* the Court stated that it need not rule on the validity of administrative segregation because this plaintiff was segregated by the medical staff.

■ While this Court has a deep and sincere sympathy for the infected inmates here in question (all are positive testers and are carriers of the disease), prison officials or this Court must also consider the rights of other inmates within the prison walls and whether or not those persons have a right to be shielded from such dangers as are known to prison authorities or may reasonably be expected to result from the close confinement associated with a prison environment which, at best, is volatile. It appears to this Court that the Plaintiffs in this case selfishly assert their rights to expose other inmates to their problems independent of any right of the other inmates to be protected from what is admitted to be a dread fatal disease of the Plaintiffs (all of whom are capable of transmitting the disease). This Court must consider the rights of the general population inmates in determining whether or not the policies in question are constitutionally permissible. The Eighth Amendment provides inmates with the right to a safe and secure environment. Allowing inmates with AIDS to be introduced into the general population may be violative of the general population inmates' Eighth Amendment right. A person is incarcerated because he or she has committed an offense which society deems justifies the taking of that person's liberty for a period of time. The period of time is commensurate with the degree and seriousness of the wrong committed. This Court is concerned that the introduction of AIDS infected inmates into the general population could possibly result in noninfected inmates', from a practical standpoint, receiving what in effect amounts to a much harsher punishment—a punishment that amounts to a death sentence. This Court is of the firm conviction that a man or woman sentenced to anything less than death is deserving of protection and, in fact, is constitutionally entitled to be protected from a situation that could result in a punishment greater than that he or she received, if such situation could be reasonably avoided by taking appropriate preventative measures. This Court is of the opinion that the policies currently in effect are appropriate measures to prevent the situation about which this Court has expressed grave concern.

■ Plaintiffs' insistence that positive-testing inmates are entitled to a hearing before confinement fails to contemplate the purpose of a hearing. The purpose of a hearing is to allow the authority to show

reasons why the infringement should be imposed on the offended party. Where the tests have demonstrated that the offended party is a carrier of a serious disease or is reasonably thought to be a carrier of a serious disease, the reason for the confinement is apparent, and there is no occasion for a hearing. An abuse of that authority may be brought to the attention of the authority or of a court. Inmates have been afforded hearings before deprival of any of their liberty interests during the trial of their criminal cases. They have no liberty interests in their place or type of confinement. There is no authority cited to this Court that there is any independent constitutional right to a due process hearing before a transfer from one prison to another or before a change in custody classification. *Montanye v. Haymes*, 427 U.S. 236, 96 S.Ct. 2543, 49 L.Ed.2d 466 (1976); *Meachum v. Fano*, 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976).

In *Turner v. Safley*, supra, 482 U.S. at 89–93, 95, 107 S.Ct. at 2261–64, 2265, the United States Supreme Court, in considering the constitutionality of an institutional restriction on inmates' correspondence, stated:

"[W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests. In our view, such a standard is necessary if 'prison administrators * * *, and not the courts, [are] to make the difficult judgments concerning institutional operations.' *Jones v. North Carolina Prisoners' Union*, 433 US [119], at 128, 53 L Ed 2d 629, 97 S Ct 2532 [at 2539 (1977)]. Subjecting the day-to-day judgments of prison officials to an inflexible strict scrutiny analysis would seriously hamper their ability to anticipate security problems and to adopt innovative solutions to the intractable problems of prison administration. The rule would also distort the decisionmaking process, for every administrative judgment would be subject to the possibility that some court somewhere would conclude that it had a less restrictive way of solving the problem at hand. Courts inevitably would become the primary arbiters of what constitutes the best solution to every administrative problem, thereby 'unnecessarily perpetuat[ing] the involvement of the federal courts in affairs of prison administration.' *Procunier v. Martinez*, 416 US [396], at 407, 40 L Ed 2d 224, 94 S Ct 1800 [at 1808], 71 Ohio Ops 2d 139 [(1974)].

" * * * [S]everal factors are relevant in determining the reasonableness of the regulation at issue. First, there must be a 'valid, rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it. *Block v. Rutherford*, 468 US [576], at 586, 82 L Ed 2d 438, 104 S Ct 3227 [at 3232 (1984)]. Thus, a regulation cannot be sustained where the logical connecton between the regulation and the asserted goal is so remote as to render the policy arbitrary or irrational. Moreover, the governmental objective must be a legitimate and neutral one. We have found it important to inquire whether prison regulations restricting inmates' First Amendment rights operated in a neutral fashion, without regard to the content of the expression. See *Pell v. Procunier*, 417 US [817], at 828, 41 L Ed 2d 495, 94 S Ct 2800 [at 2807], 71 Ohio Ops 2d 195 [1974]; *Bell v. Wolfish*, 441 US, at 551, 60 L Ed 2d 447, 99 S Ct 1861 [at 1880].

"A second factor relevant in determining the reasonableness of a prison restriction, as *Pell* shows, is whether there are alternative means of exercising the right that remains open to prison inmates. Where 'other avenues' remain available for the exercise of the asserted right, see *Jones v. North Carolina Prisoners' Union*, supra [433 U.S.], at 131, 53 L Ed 2d 629, 97 S Ct 2532 [at 2540], courts should be particularly conscious of the 'measure of judicial deference owed to corrections officials * * * in gauging the validity of the regulation.' *Pell v. Procunier*, supra [417 U.S.], at 827, 41 L Ed 2d 495, 94 S Ct 2800 [at 2806], 71 Ohio Ops 2d 2532.

"A third consideration is the impact accommodation of the asserted constitutional right will have on guards and oth-

er inmates, and on the allocation of prison resources generally. In the necessarily closed environment of the correctional institution, few changes will have no ramifications on the liberty of others or on the use of the prison's limited resources for preserving institutional order. When accommodation of an asserted right will have a significant 'ripple effect' on fellow inmates or on prison staff, courts should be particularly deferential to the informed discretion of corrections officials. Cf. *Jones v. North Carolina Prisoners' Union*, supra [433 U.S.], at 132–133, 53 L Ed 2d 629, 97 S Ct 2532 [at 2541–2542].

"Finally, the absence of ready alternatives is evidence of the reasonableness of a prison regulation. See *Block v. Rutherford*, 468 US, at 587, 82 L Ed 2d 438, 104 S Ct 3227 [at 3233]. By the same token, the existence of obvious, easy alternatives may be evidence that the regulation is not reasonable, but is an 'exaggerated response' to prison concerns. This is not a 'least restrictive alternative' test: prison officials do not have to set up and then shoot down every conceivable alternative method of accommodating the claimant's constitutional complaint. See *ibid.* But if an inmate claimant can point to an alternative that fully accommodates the prisoner's rights at de minimis cost to valid penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard.

" * * *

"We also think that the Court of Appeals' analysis overlooks the impact of respondents' asserted right on other inmates and prison personnel. Prison officials have stated that in their expert opinion, correspondence between prison institutions facilitates the development of informal organizations that threaten the core functions of prison administration, maintaining safety and internal security. As a result, the correspondence rights asserted by respondents, like the organizational activities at issue in *Jones v. North Carolina Prisoners' Union*, 433 US 119, 53 L Ed 2d 629, 97 S Ct 2532

(1977), can be exercised only at the cost of significantly less liberty and safety for everyone else, guards and other prisoners alike. Indeed, the potential 'ripple effect' is even broader here than in *Jones*, because exercise of the right affects the inmates and staff of more than one institution. Where exercise of a right requires this kind of trade-off, we think that the choice made by corrections officials—which is, after all, a judgment 'peculiarly within [their] province and professional expertise,' *Pell v. Procunier*, 417 US, at 827, 41 L Ed 2d 495, 94 S Ct 2800 [at 2806], 71 Ohio Ops 2d 195— should not be lightly set aside by the courts.

" * * *

" * * * It is settled that a prison inmate 'retains those [constitutional] rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system.' *Pell v. Procunier*, 417 US, at 822, 41 L Ed 2d 45, 94 S Ct 2800 [at 2804], 71 Ohio Ops 2d 195. * * *."

Applying these principles to the case at bar, this Court finds the following: (1) The regulations, to the extent that they impinge on Plaintiffs' constitutional rights, if at all, reasonably relate to the prime considerations of penal confinement, safety and security; (2) as demonstrated hereinabove, there is a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it; (3) there is no alternative method to protect the safety of other inmates and custodian officers and the security of the institution from spread of the disease; (4) as demonstrated by the voluntary joinder of the Intervening Defendant class of inmates in opposing release of seropositive inmates into the general population, accommodation of the asserted claims of Plaintiffs would have far more than a ripple effect on fellow inmates and on prison staff; and (5) the choice here is between releasing over 100 known carriers of a dread fatal disease into the tender fate of a general population of over 12,000 inmates—all of whom are in prison for as-

serting what society considered was not their right over the legal rights of others by whatever means they found appropriate. Penal authorities of this State are of the opinion that no one can reasonably guess what ends these 12,000 apparently healthy inmates may conceive to maintain what they believe is their right to remain healthy, nor can one reasonably guess how those having the capabilities to transfer that dread disease may use that awesome weapon against their weaker fellow inmates who think they are not infected. There is always a possibility that State officials may be sued for wrongfully allowing a homosexual rape to take place and transfer of the AIDS disease could be an alleged proximate result therefrom. *T.C. Smith v. Department of Corrections* (U.S. D.C.S.D.Fla.), No. 87–6412, filed August 1987; *Doe v. Lally,* 467 F.Supp. 1339 (D.C. Md.1979); *Campbell v. Bergeron,* 486 F.Supp. 1246 (M.D.La.1980), *affm'd.* 654 F.2d 719 (5th Cir.1981); *Streeter v. Hopper,* 618 F.2d 1178 (5th Cir.1980); *Rhodes v. Chapman,* 452 U.S. 337, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981); *Redmond v. Baxley,* 475 F.Supp. 1111 (E.D.Mich.1979); *Garrett v. United States,* 501 F.Supp. 337 (N.D.Ga. 1980); *Saunders v. Chatham County,* 728 F.2d 1367 (11th Cir.1984); *Kemp v. Waldron,* 125 Misc.2d 197, 479 N.Y.S.2d 440 (N.Y.S.Ct.1984); *Thomas v. Booker,* 762 F.2d 654 (8th Cir.1985). Minimization of the possibilities of such tragedies and resulting legal liabilities bears a clear relationship to a legitimate State interest.

A rational relationship to a reasonable State interest also arises from the State penological duty to minimize the likelihood of inmates' using actual or pretextual knowledge of AIDS carriers to coerce action by less secure inmates. Worldly inmates may well offer to protect insecure inmates from homosexual rape by supposed or actual AIDS carriers at considerable cost to the protected inmate. The Supreme Court in *Thornburgh v. Abbott,* supra, —— U.S. at ——, 109 S.Ct. at 1883, 104 L.Ed.2d, at 475 [see regulation at issue at ——, n. 5, 109 S.Ct., at 1883, n. 5, 104 L.Ed.2d at 468, n. 5], recognized the State interest in minimizing criminal activity or disorder in penal institutions. Legitimate penological objectives of this kind are best applied by those employed for that purpose, not by the court.

Plaintiffs correctly point out that *Bell v. Wolfish,* 441 U.S. 520, 559, 99 S.Ct. 1861, 1884, 60 L.Ed.2d 447 (1979), teaches a necessity for balancing of the need for a particular search against the invasion of personal rights the search entails. Where the potential spread of a disease such as AIDS has reached the stage of alarm associated therewith in the world medical society and in the public eye, the need for the particular search in question is overwhelming. Even the Plaintiffs concede at page 13 of their brief filed on August 10, 1988, in opposition to Defendants' motion to dismiss that "there is no doubt that containing the spread of the HIV virus is a matter legitimately within the State's concern." Plaintiffs, however, contend that the possibility of error in the test justifies abolishing the same. This Court cannot agree. The possibility of error in the results of the testing is extremely minimal. Testing and segregation appear to afford a possible avenue for guarding against an extremely traumatic disease. The fact that it may add some anxiety to persons already burdened with anxiety affords no good reason for unnecessarily exposing hundreds of other inmates to the fatal disease. In any event, that choice, made by prison authorities, was theirs to make and, in this Court's opinion, was a wise choice. The Plaintiffs seek to distinguish their claim of right to privacy inherent in their bodies from the right of privacy in one's jail cell denied in *Tucker v. Dickey,* 613 F.Supp. 1124, 1128 (W.D.Wis.1985). *Tucker* arguably points out that *Hudson v. Palmer,* supra, has underscored the fact that it would be literally impossible to accomplish the prison objectives of protecting inmates and staff, as well as guarding against the introduction of drugs, if inmates retained a right of privacy in their cell, because virtually the only place inmates can conceal weapons, drugs and other contraband is in their cells. Unfettered access to these cells by prison officials, thus, is imperative, *Hudson,* su-

pra, 468 U.S. at 527, 104 S.Ct. at 3200. The Plaintiffs then argue that no such imperative access exists with respect to the human body. This Court cannot agree. Where the only place a positive inmate can conceal his probability of infecting other inmates to a dread fatal disease is within his body, prison officials should have reasonable access to that hiding place so as to protect the rights of other inmates and of themselves and their families.

■ HEALTH. As to that alleged inadequate treatment for health needs of positive inmates, Plaintiffs point out that the drug AZT can significantly prolong the lives of persons with AIDS and also delay development of in-stage AIDS but that AZT has at times not been available to Alabama prisoners. In the early stages of treatments for AIDS, AZT treatment was found to have side effects. The DOC was justifiably cautious in use of AZT and other treatment and care of AIDS carriers until medical authorities recognized the propriety thereof. As its uses have been approved by the Federal Drug Administration, it has been used routinely by the DOC. State officials are obligated to provide reasonable medical care to inmates in a correctional institution but only to the extent of not being *deliberately indifferent* to the inmates' serious medical needs. That principle nearly always presents a question of fact for the Court, *Estelle v. Gamble,* 429 U.S. 97, 103, 97 S.Ct. 285, 290, 50 L.Ed.2d 251 (1976); *Rhodes v. Chapman,* 452 U.S. 337, 347, 101 S.Ct. 2392, 2399. But the court may not choose between recognized medical or penological choices. Accordingly, this Court finds that the preponderance of the evidence shows no violation of any prisoner's rights to medical or psychological or psychiatric care and no deliberate indifference to any serious medical or psychological need.[3]

A number of well-established principles of law provide a restraining force in consideration of prisoners' rights in cases such as this.

MEDICAL CARE. The Supreme Court in *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 292, 50 L.Ed.2d 251 (1976), set out the time-honored test of constitutionally insufficient medical treatment for prisoners as follows:

"In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs."

In preferencing that statement, the Court recognized that medical malpractice does not become a constitutional violation merely because the victim is a prisoner and that negligence in diagnosing or treating a medical condition, while it may be medical malpractice, is not a violation of the cruel and unusual punishment proscribed by the Eighth Amendment to the United State Constitutions. Here we have a new disease (the first case in the Alabama penal system was seen in 1987) for which treatments were largely unknown, untried and unapproved until recently. Evidence of early lack of treatment of those early AIDS patients in the penal system is not seriously inconsistent with what was done in the best of hospitals when treatments were unknown and fear of the disease was rampant. Obviously, specialists in the treatment of AIDS were until recently very difficult to find, and doctors who became experienced in that unknown and fear-controlled field were driven, either by an extreme devotion to duty, or by a necessity to practice their chosen profession when there was little room for them in more desirable and rewarding fields of medicine. It is reasonable to believe that the better doctors more often than not hoped to evade expertise in treating AIDS patients and

---

**3.** At the time this suit was instituted, the drug AZT was not available and was highly experimental and other drugs such as Aerosolized pentamidine and DDI were unheard of. However, during the pendency of this action, AZT has been made available to the AIDS infected inmates. Plaintiffs have sought prospective injunctive relief. Therefore, whether or not AZT should have been made available sooner is, thus, irrelevant. The fast moving status of research and medical advances in AIDS treatment is continually redefining what constitutes reasonable treatment.

that, even now, it is difficult in a poor State such as Alabama to obtain experts in treating AIDS and its opportunistic diseases who are willing to accept full-time employment in a penal institution. It is, therefore, understandable how and why the standards for treating AIDS patients in the Alabama penal institutions (where less than ten women and less than 150 men have been found to have been infected) are less stringent than those in such large States as New York and California where there are several thousand AIDS patients in penal institutions and experts in the disease may concentrate on their chosen field of medicine. The evidence of medical or dental neglect shown in this case by reputable evidence do not amount to a "deliberate indifference to serious medical needs". A doctor, treating a dying patient with an invariably fatal disease, instructed inferiors not to resussitate the patient when his heart and breathing stop. That doctor knows something of the torment awaiting that patient if he is brought back to life after death. The doctor is far from deliberately indifferent to a serious medical need in this Court's opinion.

The District Court for the Middle District of Georgia, in a possibly extreme case, in *Waldrop v. Evans,* 681 F.Supp. 840, 846 (M.D.Ga.1988), pointed out with citations that:

> "Several cases decided after *Estelle* * * * established the proposition that the standard of deliberate indifference for medical needs set forth in *Estelle* is equally applicable to the constitutional adequacy of psychological or psychiatric care provided at a prison. See, e.g., *Hoptowit v. Ray,* 682 F.2d 1237, 1253 (9th Cir.1982)."

That case, wherein a mentally-defective inmate was allowed to mutilate himself on three occasions [4] making himself blind and sterile, in situations which might well have been foundations for separate malpractice suits, clearly established the proposition that such malpractice did not constitute one or more violations of the cruel and unusual provision of the Eighth Amendment. This Court is aware of the fact that several experimental drugs for the treatment of AIDS are now available and being prescribed by some doctors. Common sense points to the inescapable conclusion that some, if not all, of these drugs are extremely expensive and, accordingly, are well beyond the financial reach of many of those infected with the AIDS virus. The Constitution does not mandate that every possible care or suggested care for serious disease be provided, at the public's expense, to inmates infected with the AIDS virus. The Constitution only requires reasonable medical care. There are some who would argue that what is mandated by the Constitution should not turn on the financial status of the individual. This Court cannot agree with that position. In support of this Court's position, it must only look to the analogous situation of what type of counsel is guaranteed by the Sixth Amendment. In *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the Court held that the Sixth Amendment right to counsel requires only that a defendant be provided "reasonably effective assistance". *Strickland,* supra, at 687, 104 S.Ct. at 2064. This does not require that the finest criminal defense lawyer be appointed. While all criminal defendants would prefer to have such an attorney, most cannot afford such. Therefore, they must either employ a less expensive attorney or, if they cannot afford an attorney at all, rely on the Court to appoint one. However, the fact that there are perhaps attorneys available that are more able than the one the Court appoints does not require the Court to appoint one of the more able attorneys, nor does the Constitution require such a result. The end result being that the financially less fortunate are not afforded the *best* representation, but they are afforded *constitutionally adequate* representation.

The Sixth Amendment analogy is applicable to the case at bar. AIDS infected in-

---

4. Plaintiff effectively, on separate occasions, gouged out each of his eyes and castrated himself while being treated for mental depression with drugs other than those prescribed by his private physician.

mates are not constitutionally entitled to the best treatment, rather, they are entitled to what is reasonable. This Court is of the opinion that financial considerations must be considered as one of several factors in determining reasonableness. Alabama is a poor State, and to impose a burden on it, such as has been suggested by Plaintiffs and in the recent Opinion in *Gomez v. United States,* 725 F.Supp. 526 (S.D.Fla.1989), would be too onerous a burden, and one not required by the Constitution, for the citizens of Alabama to have to bear. To hold, as was apparently implied by the Court in *Gomez,* that inmates are entitled to every drug reasonably thought to be a cure for their illness is not a demand of the Constitution. As discussed previously, in determining what amounts to reasonable care, authorities must remember that some medicines are extremely rare and, therefore, their cost is prohibitive. To require penal authorities to furnish such drugs without charge to all inmates who need such treatment would inevitably lead to such persons' submitting themselves to imprisonment solely for the purpose of securing such treatment. This Court cannot, at this time, anticipate the percentage of persons facing the dire consequences of AIDS who would likely take advantage of free treatment to the extent of committing crimes which would necessitate such free treatment. As alluded to earlier, Alabama is in a poor financial position to provide such treatment. This Court is not unsympathetic to Plaintiffs' condition; however, this Court is unable to discern, with respect to reasonable medical treatment, any appreciable difference between Plaintiffs' situation and inmates confronted with incurable cancer. Surely, no one would argue that the State is required to send inmates with cancer to hospitals wherein experimental treatment is being performed. While none of the parties has suggested that Plaintiffs are or are not entitled to be sent to a hospital where experimental treatment is being performed, it would seem that such a claim would be forthcoming if such situation subsequently developed. Just as the constitutional definition of reasonable medical care would not encompass the situation hereinbefore referred to with cancer patients, the analogous situation with AIDS inmates would not come within the purview of reasonable care. Therefore, this Court finds that the current medical care of Plaintiffs is reasonable and does not constitute deliberate indifference to Plaintiffs' medical needs. Furthermore, this Court is of the opinion that Defendants are not required to make available every drug or treatment that is being hailed as a possible cure for this dread disease.

ACCESS TO COURTS. Plaintiffs also claim a violation of their constitutional right to access to court. This claim arises from the State's alleged failure to provide sufficient and meaningful access to the prison law library or, in the alternative, if access is denied, to provide assistance by a person trained in the law. Inmates infected with the AIDS virus have a constitutional right to access to the law library or, in the alternative, to the assistance of a person with legal training. See *Bounds v. Smith,* 430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977). The State may deny access to the library for security reasons, *Holt v. Pitts,* 702 F.2d 639, 640–41 (6th Cir.1983), but must make available assistance of a person with legal training. See *Arsberry v. Sielaff,* 586 F.2d 37, 44 (7th Cir.1978); see, also, *Toussaint v. McCarthy,* 801 F.2d 1080, 1110 (9th Cir.1986). Based on the evidence before this Court, it appears that the AIDS infected inmates are entitled to more time in the library than has been allotted.[5] This Court is of the opinion that the solution to the problem could possibly be to allow the inmates with AIDS access to the library during the day, when the general population is working or recreating. This Court merely suggests this as an alternative. As discussed throughout this Opinion, difficult decisions as to what would be an appropriate policy are best left to prison officials and not the federal courts. *Jones v. North Carolina*

---

5. The evidence shows that the inmates with AIDS are allowed in the library from 9:00 p.m. until 12:00 a.m., Monday, Wednesday and Friday. The parties dispute whether or not assistance is available, particularly with respect to Dormitory 7 at Limestone Correctional Facility.

*Prisoners' Union*, 433 U.S. 128, 97 S.Ct. 2532. Presently, there does not exist sufficient evidence to determine whether or not constitutionally adequate assistance is available. Based on the deference that is due prison officials in formulating and implementing prison policy, this Court is of the opinion that the Defendants should formulate a plan that would allow for more time in the library or, in the alternative, assure effective assistance by one trained in the law.

RIGHTS OF INTERVENING DEFENDANTS. Most cases wherein the question was presented have been decided adversely to the claims of the Intervening Defendants in the instant case wherein they claim a right to have seropositive inmates [herein sometimes referred to as HIVs] mandatorily tested and segregated from the general population of the prison. Most courts follow the Supreme Court doctrine that prison officials with constant medical advice are best qualified to make that decision. In *LaRocca v. Dalsheim*, 120 Misc.2d 697, 467 N.Y.S.2d 302 (N.Y.Sup. 1983), a group of healthy New York State inmates sought a mandatory injunction requiring HIV antibody screening and segregation of seropositives within the general population of the prison. The Court in *LaRocca* declared that "in view of the scientific uncertainty concerning AIDS and the reluctance of the court to intervene in the day-to-day management of a prison, no procedural regimen regarding the protection of the rights of AIDS-free inmates shall be judicially mandated." This case arose before satisfactory HIV antibody tests became available, but the AIDS disease is still in its infancy in this country, and courts are still well advised to leave penal administration to those best trained to administer the same. Cases disposed of since that time have also decided in favor of the corrections systems' policies mostly on the ground that State Legislatures and correctional officials, not federal courts, can best decide how inmates should be protected from AIDS and the natural and probable consequences thereof. *Jarrett v. Faulkner*, 662 F.Supp. 928 (S.D.Ind.1987); *Wiedmon v. Rogers* (USDC ED NC, No.

C–85–116–G); *Maberry v. Martin* (USDC ED NC, No. 86–341–CRT); *Potter v. Wainwright* (USDC MD Fla., No. 85–1616–CIV–T15); *Stalling v. Cave* (Fla. 2nd Cir., DeLeon County); *McCallum v. Staggers* (Fla. 5th Cir., Lake County, No. 85–1338–CAOI); *Bailey v. Wainwright* (Fla. 8th Cir., Baker County); *Lloyd v. Wainwright* (Fla. 2nd Cir., DeLeon County, No. 86–3144); *Marsh v. Alabama Department of Corrections*, supra.

On the other hand, in the case of *Lareau v. Manson*, 651 F.2d 96 (2nd Cir.1981), the Court indicated that a correctional system's failure to screen inmates for a communicable disease constituted a violation of due process and "deliberate indifference to serious medical needs" of noninfected inmates.

The Supreme Court in *Thornburgh v. Abbott*, —— U.S. ——, 109 S.Ct. 1874, 104 L.Ed.2d 459, as recently as May 15, 1989, in considering the right of prison officials to deny the prisoners the right to receive some publications from the outside, recognized that the Federal Bureau of Prisons might authorize wardens pursuant to specified criteria to reject an incoming publication if it is found "to be detrimental to the security, good order, or discipline of the institution or if it might facilitate criminal activity" [at ——, 109 S.Ct. at 1883, 104 L.Ed.2d at 475]. The Court approved the standard set forth in *Turner v. Safley*, supra, 482 U.S. at 89, 107 S.Ct. at 2261–62, to the effect that regulations are valid if they are reasonably related to legitimate penological interests [—— U.S. at ——, 109 S.Ct. at 1879, 104 L.Ed.2d at 470] and rejected the "least restrictive means" test in considering rights of inmates [at ——, 109 S.Ct. at 1880, 104 L.Ed.2d at 471]. The Court further recognized that prison officials are due considerable deference in regulating the delicate balance between prison order and security and the legitimate demands of outsiders who seek to enter the prison environment and of the legitimate demands of inmates.

Both *Thornburgh*, supra, and *Turner*, supra, recognize the considerable deference due the decisions of prison officials in regulating prison order and security and in

recognizing the "inordinately difficult undertaking" that is modern prison administration. See also *Procunier v. Martinez*, 416 U.S. 396, 404–405, 94 S.Ct. 1800, 1807, 40 L.Ed.2d 224 (1974); *McCorkle v. Johnson*, 881 F.2d 993 (11th Cir.1989).

PREPARATION FOR RELEASE. Paragraphs 62 and 63 of the Complaint seek, pursuant to the Equal Protection Clause of the Fourteenth Amendment, full and equal rights with other inmates in the field of work release and other conditional release programs, education, employment, religious services, recreation, good time and parole. While such ambitions are commendable, applicability of such programs have generally not been considered applicable to persons not likely to provide the long hours necessary for success therein. Several seropositive inmates have met with little success in asserting rights to early conditional release and similar efforts to prepare at State expense for a productive future in the free world.

While a liberty interest protected by the Due Process Clause of the Fourteenth Amendment may arise either from the Constitution itself or from State law, the Court in *Hewitt v. Helms*, 459 U.S. 460, 466, 103 S.Ct. 864, 868, 74 L.Ed.2d 675 (1983), found that Alabama State law creates no liberty interest in work release. CODE OF ALABAMA [1975], § 14–8–2(a), frames work release in discretionary terms. *Francis v. Fox*, 838 F.2d 1147 (11th Cir.1988). In *Hayes v. Cuyler*, 475 F.Supp. 1347 (E.D.Pa. 1979), the Court held that *rehabilitation* opportunities have not been deemed to be a constitutional right but, rather, a privilege. In an Alabama case, *Marsh v. Alabama Department of Corrections*, supra, the Court determined that, in any event, disqualification for work release programs due to seropositivity were justifiable on the basis of institutional security and health. In *Williams v. Sumner*, 648 F.Supp. 510 (D.Nev.1986), a seropositive Nevada inmate sought to reverse his exclusion from a community work program. The Court denied the claim on the ground that prisoners have no independent constitutional rights to employment. The number of jobs available to nonsuspect applicants is at times limited and parole authorities working with prison authorities are best equipped to determine to what extent it is practical to make extensive plans for placing unfortunate inmates with terminal diseases in free-world employment.

■ Certainly, in a prison setting, there are those who must deal with needles which have been infected by use on persons with AIDS and with bodily fluids or secretions from AIDS patients. There appear to be no well-developed principles of law as to the liability of correctional systems for failure to mandatorily test, segregate and identify AIDS carriers in the prison setting. There may well be a potential liability for a State or its officials or agencies to inmates or officials who contract AIDS as a result of some claimed negligence for failure to warn or to protect inmates or officers or employees of institutions from known carriers of AIDS within the institution. Homosexual activities and personal violence as yet appear to be an inescapable part of life in the volital prison setting. Correctional systems or their officials have been held liable for damages resulting from homosexual rapes and other inmate-on-inmate assaults on the ground that inadequate supervision has been provided to prevent such incidents or on other grounds suggesting failure to protect or warn. *Campbell v. Bergeron*, 486 F.Supp. 1246 (M.D.La.1980), *affm'd.* 654 F.2d 719 (5th Cir.1981); *Streeter v. Hopper*, 618 F.2d 1178 (5th Cir.1980); *Rhodes v. Chapman*, 452 U.S. 337, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981); *Garrett v. United States*, 501 F.Supp. 337 (N.D.Ga.1980); *Saunders v. Chatham County*, 728 F.2d 1367 (11th Cir.1984); *Thomas v. Booker*, 762 F.2d 654 (8th Cir.1985). The penal institutions of the State of Alabama are best served by a continuity of experienced officials of those systems. Some employees necessarily must have contact with diseased inmates. The State has a duty to protect employees from known dangers. AIDS is a known communicable disease. Insofar as is available, knowledge of those who may be expected to spread the disease and the methods of spreading the same are

elements of the protection which the State should furnish its employees. This Court is, therefore, of the opinion that knowledge of the identity of the AIDS carriers is a matter reasonably related to a legitimate State interest. It is inescapable that correctional systems should attempt to (1) prevent high risk behavior among inmates, (2) make reasonable efforts to protect all inmates from victimization and (3) avoid any practices which could lead to unprotected blood exposure. The bounds of these duties as they relate to AIDS, and whether negligence or constitutional wrongs are involved, have not yet been clearly defined. At this early stage of the diagnosis and treatment of AIDS, these matters should best be left in the hands of prison officials with the help and advice of their medical staffs.

As the number of AIDS cases in the United States increases, and all medical reports seem to indicate that it necessarily will, the question of legal responsibility for infecting others with AIDS will undoubtedly demand a great deal of attention within the next few years. The States and their officers, whether or not currently considered immune, will face the harassment and expense of lawsuits resulting therefrom. Official records of the existence or nonexistence of the HIV antibodies on admission and discharge of each inmate are invaluable to the DOC. This Court is, therefore, of the opinion that such a potential, independent of other factors, affords a legitimate State interest in determining and recording the status of each inmate in its institutions upon entrance and upon leaving such institutions in regard to the AIDS

virus. The State, therefore, has a legitimate State interest in testing and keeping official records of the results of those tests.

It is clear that, even though the cumulative three-tests routine given inmates upon entrance and upon leaving the penal system of the State of Alabama could be sometimes inaccurate, the inaccuracy rate is less than one percent. Even though one may be exposed to an AIDS carrier in the general population in a penal institution, this Court finds that the likelihood of infection is far less when all known AIDS carriers (at least 99 of 100 according to undenied evidence) are segregated from those inmates not known to carry the disease.[6] Accordingly, a legitimate State interest of protecting inmates from a dread, fatal disease is served by mandatory testing and isolation of those inmates known to carry the disease.

The case of *Newman v. Alabama,* 559 F.2d 283 (5th Cir.1977), *modified on other grounds, Alabama v. Pugh,* 438 U.S. 781, 98 S.Ct. 3057, 57 L.Ed.2d 1114, and further explained in *Graddick v. Newman,* 453 U.S. 928, 102 S.Ct. 4, 69 L.Ed.2d 1025, clarified rights of inmates as to several of the matters complained of in this case. *Newman* teaches that visitations to State inmates and regulations pertaining thereto should be left to State authority, at 291; see also *McCray v. Sullivan,* 509 F.2d 1332, 1334 (5th Cir.1975). The right to rehabilitation and to protection from deterioration is discussed in *Newman,* at 291, and in *McCray,* at 1335, and those opinions show that:

---

**6.** This Court has considered the argument of Plaintiffs' experts that testing and segregation of known HIV seropositives cause a false security within the high-risk element of the general prison population resulting in their abandoning precautions. However, if, as those experts claim, education is the answer, knowledge of the existence of false negatives in the population, coupled with segregation of known carriers, provides protection to those likely to heed precautions and, to a lesser extent, to those who rush on where educated men fear to tread. This Court also has a duty in comparing alternatives to consider the likelihood that one alternative is more likely than the other to be used in further violations of law. There are many in penal

institutions who do not hesitate to use their assets (including actual or purported knowledge of conditions within the institution) to achieve their purposes. If the AIDS carrier is given anonymity, the bully, who purports to have knowledge of who the AIDS carriers in the institution are, would soon learn that his guarantees of protection from the carriers could be used to secure favors of money and services from newcomers in the institution, who obviously have no knowledge of local conditions. If the bully carries AIDS, he may well infect those whose homosexual activities he purports to protect. If he is physically clean, he may well use his apparent knowledge to extort property from those he purports to serve.

"The Constitution does not require that prisoners * * * be provided with any and every amenity which some persons may think is needed to avoid mental, physical or emotional deterioration."

Indeed, deterioration will ultimately overtake us all. The test is whether there is a deliberate indifference to a serious medical or psychological need. Theories of rehabilitation have lost favor in recent years. Penologists agree that it depends largely upon the determination and abilities of the subject and is best applied to those showing such qualities at an early stage. As hereinbefore recognized, there is no right to rehabilitation in the Constitution. The *Newman* Court stated, at 288, that there is no constitutional basis for the requirement in *Newman* of 60 square feet of space for each inmate or single cells. See also, *Rhodes v. Chapman*, 452 U.S. 337, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981). The *Newman* Court provided, at 292, that the Constitution provides nothing in the way of free education for inmates except where, pursuant to the Equal Protection Clause of the Constitution, others of equal status are provided equal education. That Court also points out that the basics required for inmates (at 286–288) are food, shelter, clothing, sanitation, necessary medical attention and personal safety; that inmates, by virtue of their status as convicted felons, yield such constitutional rights as are inconsistent with their status as prisoners and rights which conflict with a legitimate penological objective (at 286); and that safety and security are the prime considerations for prison authorities (at 291) who should not be required to maintain prison security "with one eye on the subject and the other on the consequences of contempt, in which the district court could convert a warden into a prisoner" (at 291). The Court further pointed out that State prison officials are far better equipped to pass on the many minute questions that arise in prison administration than are federal judges and that the Court must ever keep in mind the principles of federalism under which our Constitution is drawn (at 287).

■ SECTION 504 CLAIM. Plaintiffs claim a violation of § 504 of the Rehabilitation Act of 1973. 29 U.S.C. § 794. In pertinent part, § 794 states: "No *otherwise qualified* handicapped individual * * * shall, solely by reason of his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance * * *." In order to decide if Plaintiffs are entitled to any relief on this claim, this Court must determine whether the inmates infected with the AIDS virus are "otherwise qualified".

"When a person is handicapped with a contagious disease this task requires the judge to conduct an individualized inquiry and to make appropriate findings of fact, 'based on reasonable medical judgments * * * about (a) the nature of the risk (how the disease is transmitted), (b) the duration of the risk (how long is the carrier infectious), (c) the severity of the risk (what is the potential harm to third parties) and (d) the probabilities the disease will be transmitted and will cause varying degrees of harm.' *School Bd. v. Arline*, 480 U.S. 273, 107 S.Ct. 1123, 1131, 94 L.Ed.2d 307 (1987). As a second step [this] [C]ourt must evaluate whether reasonable accommodations would make the handicapped individual otherwise qualified." *Martinez v. School Bd.*, 861 F.2d 1502, 1505 (11th Cir.1988).

Applying these guidelines to the instant case, this Court finds the following:

(1) The disease is transmitted by contact of open wounds or body cavities with blood, semen or vaginal secretions. The primary ways the disease is transmitted in the prison environment is through homosexual activity, intravenous drug use and tattooing. Exchange of bodily fluids by homosexual rape or of blood resulting from fights is particularly hazardous in prison settings.

(2) The duration of the risk is perpetual.

(3) The severity of the risk is great with the potential harm to third parties' ultimately being death.

(4) The probability of transmission, in the prison environment, is significant.

Accordingly, this Court finds that the AIDS infected inmates are not otherwise qualified.

This Court must now determine whether or not reasonable accommodations could make Plaintiffs otherwise qualified. *Martinez*, supra. "If, after reasonable accommodations, a significant risk of transmission would still exist, [Plaintiffs] would not be otherwise qualified." *Martinez*, 861 F.2d at 1506; see also *Arline*, supra, 480 U.S. at 287, n. 16, 107 S.Ct. at 1131, n. 16. Accordingly, this Court finds that, after reasonable accommodations, a significant risk of transmission would still exist. Therefore, Plaintiffs are not otherwise qualified within the requirements of § 504 of the Rehabilitation Act of 1973. As support for its finding, that reasonable accommodations would not reduce the significant risk of transmission, this Court incorporates its earlier finds with respect to the reasons that support segregation.

CONCLUSION. This Court is of the opinion that the testing program does not amount to an unreasonable search and seizure or an invasion of a constitutionally protected privacy; that Plaintiffs have shown no credible evidence of failure to provide adequate care for serious medical, dental and mental health needs amounting to cruel and unusual punishment in violation of the Eighth Amendment; that the totality of other conditions to which seropositive prisoners are subjected does not inflict cruel and unusual punishment; that the submission of Defendant inmates to close contact with known AIDS carriers could well be considered as invasive of constitutional rights of the Defendant prisoners; that the differential treatment of seropositive prisoners does not violate equal protection of the laws in violation of the Fourteenth Amendment; that the segregation of such prisoners classified as shown by the evidence does not offend constitutional rights even when done without a hearing; that the public disclosure of positive tests is not a violation of right of privacy of the positive inmates; that the recent policy with respect to library hours does not constitute a denial of meaningful access to prison legal materials nor does it deny them their right of access to courts in violation of the First or Fourteenth Amendment; and that conditions and practices to which seropositive prisoners are subjected does not constitute a discrimination against them as handicapped individuals in violation of § 504 of the Rehabilitation Act of 1973, 29 U.S.C. §§ 701, *et seq.*, because the preponderance of the evidence does not show them to have been otherwise qualified for the privileges claimed by them.

For the reasons and upon the authority set out herein, this Court is of the opinion that the Alabama State laws and policies in regard to testing for AIDS and treatment of those reacting positively to tests therefor were not shown by a preponderance of the evidence to have been unconstitutional.

An Order will be entered in accordance with this Opinion.

ORDER

In accordance with the opinion entered in the above-styled cause on this date, it is

ORDERED by this Court that all relief requested by Plaintiffs be, and the same is hereby, denied, and the above-styled cause is hereby dismissed with no costs taxed herein.